# EXHIBIT A

1

**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**

Michael J. Saltz, Esq.  SBN 189751
msaltz@jrsnd.com
Colby A. Petersen, Esq. SBN 274387
cpetersen@jrsnd.com
1880 Century Park East, Suite 900
Los Angeles, CA  90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909

2

3

4

5

6

Attorneys for Defendant ON-SITE MANAGER, INC.

7

8

## UNITED STATES DISTRICT COURT

9

## NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| MICHAEL JOHNSON,<br><br>        Plaintiff,<br><br>    vs.<br><br>ON-SITE MANAGER, INC.,<br><br>        Defendant. | Case No.: 5:15-cv-04409-BLF<br><br>**DEFENDANT ON-SITE MANAGER, INC.'S EXPERT WITNESS DISCLOSURES**<br><br>Complaint filed:   September 23, 2015<br>First Amended Complaint filed:<br>                 January 6, 2016<br>Trial Date:        January 8, 2018<br><br>Judge:          Hon. Beth L. Freeman |

11

12

13

14

15

16

17

18

19

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

20

Pursuant to Federal Rules of Civil Procedure, Rule 26(a)(2), Defendant On-Site

21

Manager, Inc., (hereinafter referred to as "Defendant"), hereby designates the

22

following expert witness based upon information currently available to it. Defendant

23

reserves the right to further correct, add, remove and/or otherwise supplement this

24

disclosure pursuant to Rule 26(a)(2)(E).

25

1.    **EXPERT WITNESS**

26

a. Rebecca E. Kuehn, Hudson Cook, LLP, 1909 K Street, N.W., 4th

27

Floor, Washington, DC 20006, (202) 715-2008, rkuehn@hudco.com.

28

JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP
1800 Century Park East, Suite 900
Los Angeles, California  90067
Tel. 310.446.9900 • Fax 310.446.9909

JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP
1800 Century Park East, Suite 900
Los Angeles, California 90067
Tel. 310.446.9900 • Fax 310.446.9909

b.  Mrs. Kuehn's report, curriculum vitae, and testifying history have been served upon Defendants and are attached hereto as Exhibit 1. Mrs. Kuehn may be called to testify regarding the consumer reporting industry and use of public records in tenant screening reports, including expert testimony about the nature, business, and standard practices relating to identifying potentially relevant public records. In addition, Mrs. Kuehn may be called to testify regarding her expert opinion on the following topic: Whether the procedures used by On-Site and its third party vendors to identify consumers with public records to ensure maximum possible accuracy of public records are (1) consistent with industry standards and practice, (2) consistent with the experience and understanding I obtained during my tenure at the FTC, and (3) otherwise reasonable based on her knowledge of the industry and as to any other subjects or opinions referenced in his report and/or subsequent deposition testimony, including reasonable inferences arising therein.

Dated: May 21, 2017

**Jacobson, Russell, Saltz,**
**Nassim & de la Torre, LLP**

/S/ Michael J. Saltz
_____
Michael J. Saltz, Esq.,
Attorneys for Defendant On-Site Manager, Inc.

**EXHIBIT "1"**

**EXPERT REPORT OF REBECCA E. KUEHN**

Michael Johnson

v.

On-Site Manager, Inc.

May 21, 2017

## I.      INTRODUCTION.

My name is Rebecca E. Kuehn.  I prepared this expert report at the request of counsel for On-Site Manager, Inc. ("On-Site"), who has asked me to offer expert testimony on the consumer reporting industry and use of public records in tenant screening reports, including expert testimony about the nature, business, and standard practices relating to identifying potentially relevant public records.  On-Site has also asked me to give my expert opinion on the following topic:  Whether the procedures used by On-Site and its third party vendors to identify consumers with public records to ensure maximum possible accuracy of public records are (1) consistent with industry standards and practice, (2) consistent with the experience and understanding I obtained during my tenure at the FTC, and (3) otherwise reasonable based on my knowledge of the industry

## II.     EXPERT QUALIFICATIONS.

I am an expert in the policies, procedures, and practices of consumer reporting agencies ("CRAs") to ensure compliance with the Fair Credit Reporting Act ("FCRA").  I developed this expertise through substantial experience in the industry, including through advising CRAs, lenders, and other users of credit reports on the development of procedures designed to comply with the FCRA.  I also gained expertise and insight into the practices of the industry through my work at the Federal Trade Commission ("FTC"), which is a federal agency tasked with the enforcement of the FCRA.

In all, I have nearly two decades of experience in advising companies, consumers, industry, and policymakers on the FCRA and its requirements.  Beginning in 1997, with the advent of litigation against credit furnishers following the 1996 amendments to the FCRA, I defended banks and other financial institutions against claims asserting violations of the reinvestigation provisions of the FCRA.  My practice expanded to include litigation and counseling matters involving CRAs and public records vendors that retrieve records for use by CRAs.  Through this work, I developed an expertise in the FCRA, which led to my move to the FTC.

In May 2006, I was appointed as an Assistant Director in the Division of Privacy and Identity Protection at the FTC.  That division oversees issues related to consumer privacy, credit reporting, identity theft, and information security.  In that role with the FTC, I led the FCRA program and oversaw the FTC's enforcement, outreach, and rulemaking activities in that area.  I regularly coordinated with federal financial agencies in developing, issuing, and interpreting interagency rules, such as the Affiliate Marketing Rule, the Risk Based Pricing Rule, the Accuracy and Direct Disputes Rules, and amendments to the Gramm-Leach Bliley Privacy Rule.

1

During my tenure at the FTC, I also supervised a number of investigations involving employment and tenant screening companies, some of which resulted in cases brought by the FTC.[1]  My experience in this regard is broad, and specifically includes involvement in issues relating to the accuracy of public records.  My work at the FTC also included oversight and participation in the development of education about the use of consumer reports in tenant and employment screening.[2]

Building on my knowledge and understanding of the consumer reporting industry in this country, my work at the FTC additionally supported global credit reporting initiatives.  For example, in 2007, while at the FTC, I was selected to work with the U.S. Agency for International Development (known as "USAID") to provide technical assistance to the Central Bank of Egypt in the development of regulations and oversight over credit bureaus.  I worked with representatives of the Central Bank to provide them insight into the FCRA and oversight over credit bureaus in the United States.  I also served as the FTC's representative to the World Bank Task Force on Credit Reporting.  This international Task Force worked to develop an agreed framework in the form of international standards for credit reporting systems' policy and oversight.  This work culminated in a report, *General Principles for Credit Reporting*, issued September 2011.[3]

From September 2011 through April 2015, I served as Vice President and Senior Regulatory Counsel for CoreLogic, Inc., which is a leading provider of consumer, financial and other information, analytics and services to business and government.  In that capacity, I was the lead lawyer and coverage counsel for CoreLogic's credit reporting and consumer data businesses, which included a tenant screening company, a credit report reseller, and a CRA that provides reports in the short-term lending market. CoreLogic also is a public records vendor, and obtains, normalizes, and licenses public record data of different types, including data on real estate transactions, criminal records, and tenant history data.

In my role as counsel to CoreLogic, I worked with operations and compliance personnel to develop and revise policies, procedures, and standards related to data acquisition and normalization for public record data used in consumer reports.  I also worked on policy issues related to access to public records.  I provided advice and guidance to management on a wide

---

[1]  *See, e.g., United States v. Rental Research Services, Inc., et al.*, available at https://www.ftc.gov/enforcement/cases-proceedings/072-3228/rental-research-services-inc-corporation-et-al-united-states; *United States v. First Advantage SafeRent, Inc., et al.,* available at https://www.ftc.gov/enforcement/cases-proceedings/082-3016/first-advantage-saferent-inc-et-al-usa-ftc.

[2]  In my role as Assistant Director, I spoke at a number of industry conferences about the work of the FTC and the requirements of the FCRA.  A selected list of presentations is listed in Exhibit B.

[3]  *See* The World Bank, "General Principles for Credit Reporting" (Sept. 2011), *available at* http://siteresources.worldbank.org/FINANCIALSECTOR/Resources/Credit_Reporting_text.pdf (last visited 9/25/15).

variety of consumer data and privacy-related regulatory issues, including the FCRA and Gramm-Leach Bliley Act.

I am currently a partner at the law firm Hudson Cook, LLP, a leading firm in consumer financial services law and compliance.  I joined the firm in April 2015 and am based in the firm's Washington, D.C. office.  At Hudson Cook, I work with financial institutions and consumer reporting clients of different sizes that I advise on legal compliance matters.  My practice is focused on consumer privacy and consumer reporting issues.  I regularly provide advice and representation to businesses involved in the consumer reporting industry, including CRAs, users of consumer reports (*e.g.*, automotive finance companies), and furnishers of information to CRAs (*e.g.*, credit card companies).

I am an active member of the Consumer Financial Services Committee, which is part of the American Bar Association's Section of Business Law.  I regularly monitor the case law, industry developments, and government activities relating to the FCRA and matters of consumer data privacy more generally.  I speak frequently at industry and legal conferences on FCRA and other financial services and privacy topics.  I have been participating as an Observer in the Uniform Law Commission's drafting committee on criminal records accuracy.

The publications I have authored in the past 10 years also are listed on Exhibit B, which is attached to my Report.  With respect to prior expert witness testimony, I qualified and testified as an expert in October 2016 at a preliminary hearing in an arbitration proceeding.  The arbitration proceeding is confidential.

I hold a Bachelor of Arts degree (*summa cum laude)* from Frostburg State University and a Juris Doctor (*with high honors*) degree from the National Law Center at George Washington University.  I am a member of the Virginia, Maryland, and District of Columbia bars.  A copy of my resume is appended hereto as Exhibit C, which also contains a list of selected presentations that I have given.

I am being compensated at a rate of $780 per hour for my work in this matter.

III.     NATURE AND REGULATION OF THE CONSUMER REPORTING INDUSTRY.

A.      **The Fair Credit Reporting Act**.

Enacted in 1970, the Fair Credit Reporting Act—or FCRA—governs the collection, assembly, and use of consumer report information and provides the framework for our nation's consumer reporting system.  Its purposes are (1) to protect consumers by preventing the misuse of their sensitive personal information and improving the accuracy of consumer report information; and (2) to promote the efficiency of the nation's banking and consumer credit systems.[4]

The FCRA regulates the practices of the three principal groups involved in the credit reporting system:  (1) consumer reporting agencies ("CRAs"), some of which are referred to as credit bureaus; (2) furnishers of consumer report information to the CRAs; and (3) users of consumer reports.  CRAs collect and compile consumer information into consumer reports and provide them to authorized users—for example, credit grantors, insurance companies, employers, and landlords—that make eligibility decisions about those consumers.  Information included in consumer reports typically includes the consumer's credit history and payment patterns supplied by furnishers, as well as demographic, identifying, and public record information (*e.g.*, judgments, and bankruptcies).  The reports help businesses by enabling them to predict the risk of future nonpayment, default, or other adverse events.

In enacting the FCRA, Congress recognized the value of the consumer reporting industry, finding that CRAs "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers."[5]  The FCRA "seeks to balance the needs of consumers and businesses" with respect to the use of consumer information.[6]

The primary enforcement agency for the FCRA since its enactment in 1970 has been the Federal Trade Commission ("FTC").  The FTC has brought over one hundred enforcement actions for asserted violations of the FCRA.[7]  In addition, although it has only limited formal rulemaking authority, the FTC has offered extensive interpretations and guidance on the FCRA over the years, including issuing over 430 opinion letters and eight formal interpretations, as well as publishing a compliance manual and other educational tools for businesses.  These FTC documents are routinely relied upon by businesses, regulators, and even policymakers.  In 1990, the FTC published a "Commentary," consolidating all of its FCRA guidance issued to that

---

[4]     Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act:  An FTC Staff Report with Summary of Interpretations* (July 2011) ("40 Years Report"), at 1.

[5]     15 U.S.C. § 1681(a)(3).

[6]     S. Rep. No. 209, 103rd Cong., 2d Sess. (1993).

[7]     40 Years Report at 4; *see also* FTC's website page on FCRA: https://www.ftc.gov/tips-advice/business-center/privacy-and-security/credit-reporting (last visited 11/23/15).

date.  In July 2011, the Commentary was incorporated in large part, along with other FTC formal and informal guidance and interpretations, into the FTC's *40 Years Report*.  The Report was provided to the Consumer Financial Protection Bureau ("CFPB"), which shares enforcement authority over the FCRA with the FTC and also has rulemaking authority.[8]  The Report is relied upon by government and industry as an authoritative source on the FCRA.

## B.    Maximum Possible Accuracy

Section 607(b) of the FCRA, 15 U.S.C. § 1681e(b), requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  It is critical to understand that the FCRA does not establish a strict liability standard for CRAs with respect to the accuracy requirement, but requires only that CRAs act reasonably.  Section 602(b) of the FCRA, 15 U.S.C. § 1681(b), states that "[i]t is the purpose of [the FCRA] to require that consumer reporting agencies adopt reasonable procedures … with regard to the confidentiality, accuracy, relevancy, and proper utilization of [consumer report] information in accordance with the requirements of this title."

The duty to follow reasonable procedures is not static.  As explained in the 40 Years Report, "when a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems."  40 Years Report at 67.

Much of the FCRA is focused on data provided by furnishers, which are entities that have some relationship with the consumer and are providing data to consumer reporting agencies for inclusion in a consumer report.  The CRAs have addressed the issues surrounding accuracy of information obtained from furnishers by performing background and quality control checks on would-be-furnishers, obtaining information electronically using a standardized format and performing quality checks prior to adding the data to credit files. [9]

With respect to public records, however, the challenges are different.  Consumer reporting agencies need to obtain records from public record sources in a variety of jurisdictions with varying degrees of sophistication.  Further, the amount of identifiers appearing in public records has decreased greatly over time, and many public records contain

---

[8]    40 Years Report at 5-7.  Specifically, the CFPB and FTC have concurrent FCRA enforcement authority over non-depository institutions.  With respect to banks and other depository institutions, which are exempt from FTC authority, the CFPB shares jurisdiction with the federal bank regulatory agencies.

[9]    *See* Consumer Financial Protection Bureau, *Key Dimensions and Processes in the U.S. Credit Reporting System: A review of how the nation's largest credit bureaus manage consumer data* ("Key Dimensions"), December 2012 (noting that credit bureaus has established standardized reporting formats and that they "deliver credit reporting information to users in standardized electronic formats") , at 3, 10, 14.

only a name, possibly an address, and more rarely, a date of birth.  Most states prohibit or restrict the inclusion of Social Security numbers (SSNs).  See, e.g., 65 P.S. § 67.708(B)(6)(i)(A); Va. Code § 59.1-443.2  This can be attributed, in part, to the work of the FTC and other federal agencies in advocating for the removal of SSNs from public records as a means of reducing identity theft.[10]  Further, there has been a recent trend to truncate or mask dates of birth from criminal records.  In my experience in working with public records, landlord tenant records rarely (if ever) contain any personal identifiers apart from a consumer's name and the address at the time of eviction.  Therefore the ability of any consumer reporting agency to identify a particular public record as relevant to a particular consumer (or to eliminate any particular record) is limited.

## IV.    UNDERSTANDING OF THE CASE.

It is my understanding that plaintiff Michael Johnson commenced this action against On-Site seeking money damages under the Fair Credit Reporting Act.  Plaintiff alleges that he was "denied housing opportunities" on the basis of a landlord tenant record belonging to a "Michael Johnson."

In forming my opinions, I have become aware and gained a complete understanding of the facts and allegations involved in the present case.  The materials I reviewed in this regard are listed in Exhibit A.  My report often references these sources where helpful and appropriate; however, I have reviewed all of the materials listed on Exhibit A, and the absence of any specific reference does not mean that I did not consider it in forming a particular opinion or making any particular statement.  Though the following description of the case is not exhaustive, it is my understanding that the record reflects the following basic facts.

- On or before June 9, 2015, Plaintiff applied to the River Pointe Apartments ("River Pointe").  River Pointe in turn requested rental screening reports from On-Site.

- As part of the initial screening, On-Site requested records from LexisNexis, its public records vendor, which it re-sold to River Pointe in conjunction with a credit report from Equifax – one of its credit report vendors.

- According to Eric Basart for On-Site, LexisNexis uses an algorithm that includes a search that looks for variations of names, including nicknames, to identify potential matches within a defined geographic area.

---

[10]   *See The President's Identity Theft Task Force Report*, September 2008, at 9-10 (summarizing the Task Force's work with states to reduce the presence of SSNs in public records), available at https://www.ftc.gov/sites/default/files/documents/reports/presidents-identity-theft-task-force-report/081021taskforcereport.pdf.

- As part of its policies and procedures to ensure maximum possible accuracy, On-Site has instituted a practice of preparing "Preliminary Reports."  See Investigating and Resolving Disputes (revised May 12, 2015) at p. 3.  On-Site's procedures note that "sometimes the renter herself is the best source of information."

- As part of the Preliminary Report process, On-Site provides consumers with a copy of the Preliminary Report at the same time it provides them to its clients if the client provides an email address for the consumer "so that the renter may review and verify the accuracy and completeness of that information."  On-Site encourages its clients not to rely on preliminary reports for the purposes of making any rental decisions "until such time as the renter is given a full opportunity to review and address any adverse items of information that would otherwise impede the renter's ability to obtain rental housing."

- A preliminary report was prepared on or around June 9, 2015.  That preliminary report identified a Civil Action for Possession filed by LeFever Mattson against "Michael Johnson" in Sacramento, California.

- The court records associated with Civil Action for Possession do not contain any social security number (full or partial) nor do they contain a date of birth for the defendant Michael Johnson.  The records indicate that the address of the property was on Hurley Way in Sacramento, California.  See Michael Johnson Case File 10UD10966.

- The preliminary report also included a collection account from Equifax involving LeFever Mattson dated February 2010.  The collection account noted an original balance of $385, with a current balance of $0.  Notably, the preliminary report noted that certain items were still "Pending" and was not a final report.

- On June 9, 2015, Mr. Johnson spoke to On-Site, which informed him that there was a landlord tenant filing, as well as insufficient income and derogatory credit.  On-Site requested that Mr. Johnson provide it with "dismissed/satisfied doc from the court or a letter from the property stating not evicted and no balance owed."  On-Site did not hear back from the consumer.

- On June 28, 2015, On-Site received documentation from River Pointe, which in turn had received it from Mr. Johnson.  The documentation included a June 19, 2015 letter from Mr. Johnson's counsel, Erin Novak, stating that "the Michael Johnson who was the subject of the judgment is not the Michael Johnson who is applying for an apartment with your company."  That letter attached rental history records for the Plaintiff Mr. Johnson, who previously held a lease with LeFever Mattson on Hurley Way in Sacramento, California.  Those rental history records indicate that Plaintiff Michael Johnson owed LeFever Mattson $385 at move out, the same amount reflected in the

collection account reported by Equifax.  The records provided by Plaintiff's counsel show, however, that although Plaintiff Johnson also had previously rented an apartment at the same street address as reflected in the landlord-tenant record, the unit number for Plaintiff Michael Johnson was different from that of the "Michael Johnson" identified in the Civil Action for Possession.

- On-Site's dispute procedure requires On-Site to remove a landlord tenant court record if "the applicant is not the person identified as the defendant in the action."

- The same day that it received the information from River Pointe, On-Site removed the landlord-tenant action from Mr. Johnson's report "as unit number did not match (filing said 90 report and ledger show [sic] unit 51" and emailed River Pointe the updated and final report.

- The rental report upon which River Pointe relied in its determination of whether to rent to Mr. Johnson did not contain the record associated with landlord tenant record.  See Rental Report for Michael Johnson at p. 2 ("There were no previous Landlord Tenant Court records found.").

- River Pointe's own internal score it calculated for Mr. Johnson based entirely on its own criteria indicates that he <u>failed</u> to meet the following minimum qualifications to be eligible to rent at River Pointe: (a) Total monthly income to rent ratio exceeds 3.0; (b) Gross monthly income after rent and estimated debt exceeds 40.0% of the monthly income; and (c) Maximum percentage of past due negative accounts is less than 25.0%. Notably, the report indicates that Mr. Johnson passed the qualification for "No Landlord Tenant Court records or unpaid landlord collections in the last 7 years."  Further, the notice of adverse action sent to Mr. Johnson does not indicate that he was declined based on a landlord tenant record; rather, the notice indicates that the key factors that adversely affected his rental score were that he had insufficient income ("Your income is not high enough to qualify"), that he had a high debt-to income ratio ("Debt payments consume too much of your income"), and that he had a poor credit history ("Too many of your credit accounts report negative information"). See Letter to Michael Johnson dated July 25, 2015.

- River Pointe emailed Michael Johnson a copy of the Rental Report on which its decision was based on July 25, 2015. That report did not include the landlord tenant record about which Mr. Johnson complains.

- Plaintiff Michael Johnson filed the instant lawsuit on September 25, 2015.  He alleges that he has suffered actual damages "in the form of lost housing opportunity, harm to reputation, emotional distress, including anxiety, frustration, humiliation, and embarrassment."

- Since June 2015 through the present, no other landlord has requested a report from On-Site related to Mr. Johnson.

## V.    EXPERT OPINIONS.

**A.    *The procedures used by On-Site and its third party vendors to identify consumers with public records to ensure maximum possible accuracy in the reporting of public records are (1) consistent with industry standards and practice, (2) consistent with the experience and understanding I obtained during my tenure at the FTC, and (3) otherwise reasonable based on my knowledge of the industry*.**

In its preparation of rental screening reports, On-Site obtains public record information from LexisNexis and re-sells its information to its clients.  The search algorithm used by LexisNexis to identify potentially relevant public records is a name-based search that locates records based on name variations, nicknames, and phonetically similar names (such as Smith and Smyth) with a defined geographic area.  In this case, the match algorithm identified a record belonging to "Michael Johnson" (same spelling) in Sacramento, California as potentially relevant to the Plaintiff Michael Johnson, whose application indicated that he lived in West Sacramento, California.

In searching for potentially relevant public records, it is a generally accepted practice to search using name and geographic area to identify possible matches.  Eviction records rarely, if ever, contain any personal identifiers such as social security number, date of birth, or biometric information.  The records were matched based on the same name and geographic area – which in this instance was narrowed down to the same street as Mr. Johnson's prior address.  The identification of the Sacramento, California landlord tenant record as potentially relevant is consistent with industry standards and practice.

Further, it was within industry standards and practice for On-Site to rely on the data provided by LexisNexis, particularly where, as here, the data contains no obvious errors or inconsistencies.  On-Site had no prior knowledge that the information returned by LexisNexis was not related to Mr. Johnson.[11]  A comparison of the landlord tenant record reflected on the Preliminary Report and the underlying court records demonstrates that the entry on the report accurately reflected the public record.  I further note that the landlord tenant record also was

---

[11]   When On-Site learns that a particular public record is not associated with a particular consumer, On-Site has a process by which it tags that record with a consumer's social security number so that it able to prevent such record from appearing in any future reports for the consumer.  Prior to preparing the Preliminary Report, On-Site had not received any prior disputes or other information indicating that this record was not associated with Plaintiff Johnson.  After the receipt of the information forwarded by River Pointe, however, On-Site tagged the landlord tenant record to prevent it from reappearing on any future reports requested on a Michael Johnson with the Plaintiff's social security number.

consistent with the collection record reported about the Plaintiff by Equifax – both records involved the same property company, LeFever Mattson.

On-Site, however, does not rely solely on the fact that a public record is identified through a search algorithm.  It also goes above and beyond industry practice by seeking verification from the consumer through its Preliminary Report process.[12]  On-Site's procedures note that "although this will take more time and effort than normally applied to the screening process, it will ultimately help prevent renters from suffering any negative impact if and when a third-party vendor doesn't get it completely right."  See Investigating and Resolving Disputes.

In this case, the process worked exactly as designed.  After On-Site prepared the Preliminary Report, Mr. Johnson contacted On-Site that same day about the negative information in his report.  An On-Site employee provided Mr. Johnson with instructions on the type of information that he could provide to On-Site to address those items.  Although Mr. Johnson did not follow up with On-Site, his counsel later provided information shortly thereafter to River Pointe, which in turn forwarded it to On-Site.  On-Site reviewed the information and corrected the report the same day.

Although Plaintiff's complaint alleges that he has suffered a "lost housing opportunity" as a result of the landlord tenant record, the Preliminary Report process ensured that the decision about his application at River Pointe was not based on information about another "Michael Johnson."  Although Mr. Johnson's application ultimately was denied, that decision was based on his income (both relative to the expected rent and his other outstanding obligations) and other information appearing in his credit report, which information he does not appear to dispute.  Further, On-Site has not provided reports on Mr. Johnson to any other potential landlords, and the fact that the record was reflected only on a Preliminary Report and the speed within which On-Site corrected the report once it received the information forwarded by River Pointe greatly reduced the possibility that Mr. Johnson would suffer any harm as a result of the landlord tenant record.[13]

Based on my review of the records, On-Site removed the record from the report the same date on which it was notified that the records were not associated with the Plaintiff. River Pointe notified On-Site regarding the landlord-tenant record after receiving the

---

[12]    The FCRA does not require that consumer reporting agencies proactively provide copies of consumer reports to consumers at the same time that such reports are provided to the end users.  Rather, the FCRA requires only that a consumer reporting agency provide a copy of a consumer report upon request from the consumer.

[13]    As at least one other court has noted, the speed of correction "militates against [a] claim of demonstrable emotional injury."  *Wenning v. On-Site Manager, Inc.*, 2016 WL 3538379 (S.D.N.Y. June 22, 2016).  In the *Wenning* case, the plaintiff claimed that the use of the term "forcible entry/detainer" in her tenant screening report made her feel "like she was being called a criminal."  *Id*. at *21.  She promptly retained counsel who, working with On-Site and plaintiff's former landlord, secured the removal of the phrase from her On-Site report within a week of learning of the issue.  *Id*.  In granting summary judgment for On-Site, the court noted that "[u]nder the FCRA . . . the alacrity with which Wenning obtained a corrected On-Site report hurts her claim for emotional distress."  *Id*.

documentation from the Plaintiff, and On-Site removed the landlord tenant record and sent an updated report that same day.   The record further shows that the identification of the landlord tenant record as a potential match did not affect the River Pointe's rental decision, as that decision was based on income and credit-related criteria, not the presence of a landlord-tenant record.  In short, On-Site's procedure to provide preliminary reports for the consumer to review, and to promptly review information provided by a consumer to update those reports, ensures that such public records are treated properly and that public records that do not relate to a consumer do not negatively impact that consumer.

**SIGNED:**

May 21, 2017                                   _____

                                                        Rebecca E. Kuehn

# EXHIBIT A

**Exhibit A to Expert Report of Rebecca Kuehn**

**Materials Considered and/or Relied Upon**

Documents from Johnson v. On-Site

1. Johnson v. On-Site Investigating & Resolving Disputes (5.12.15)
2. Johnson v. On-Site - Michael Johnson Case File 10UD10966
3. Johnson v. On-Site River Pointe Report
4. Johnson v. On-Site Johnson- Adverse Action
5. Johnson v. On-Site 5385-011 Ltr. re Michael Johnson and Inaccuracies on On-Site consumer report 6-19-15
6. Johnson v. On-Site 5385-011 Doc. 1 - Complaint 9-25-15
7. Johnson v. On-Site Plaintiff's Initial Disclosures - JOHNSON-1 through JOHNSON-19
8. Johnson v. On-Site 5385-011 Further Responses to Interrogatories to On-Site Manager Set One 4-21-17
9. Johnson v. On-Site Plaintiff's POS re Initial Disclosures (Johnson)
10. Johnson v. On-Site 5385-011 Doc. 16 - First Amended Complaint 1-5-16
11. Johnson v. On-Site Plaintiff's Initial Disclosures (Johnson) 2-17-2016
12. Johnson v. On-Site 5385-011 Doc. 17 - Def's Answer to First Amended Complaint 1-19-16
13. Johnson v. On-Site Data Suppression Algorithm
14. Johnson v. On-Site RenterRelations.com Request Report Page
15. Johnson v. On-Site River Pointe Leasing Summary
16. Johnson v. On-Site Internal Notes
17. Johnson v. On-Site River Pointe Application - Required Fields
18. Johnson v. On-Site Response 29
19. Johnson v. On-Site Rental Report for Michael Johnson (final) (noting rejection July 25, 2015)

Other

Interview with Eric Basart

The World Bank, *General Principles for Credit Reporting*, September 2011

Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act:  An FTC Staff Report with Summary of Interpretations*, July 2011

All additional and/or other materials cited and/or referenced in my Report, including statutes, regulations, government publications, and websites.

# EXHIBIT B

**Exhibit B to Expert Report of Rebecca Kuehn**

**Additional Information**

<u>**Publications Authored by Rebecca Kuehn**</u>

Kuehn, Rebecca, and Denson, Allen H.; *Important Rules of the Road for BHPH Dealers who Furnish Information to Credit Bureaus*; Spot Delivery, September 2015

Kuehn, Rebecca, and Musselman, Meghan S., *Third Circuit Thwarts Challenge to FTC's Data Security Authority*, Spot Delivery, September 2015

Kuehn, Rebecca, and Zaman, Latif, *New York Court of Appeals to Consider Scope of Law Prohibiting Discrimination Based on a Criminal Conviction*, Hudson Cook Insights, January 2017

# EXHIBIT C

**Rebecca E. Kuehn**
Hudson Cook, LLP
1909 K Street, N.W., 4th Floor
Washington, DC  20006
202-715-2008
rkuehn@hudco.com

## Professional Profile

Experienced consumer financial services attorney with significant privacy expertise.

## Work Experience

**Hudson Cook, LLP**, Washington, D.C.
Partner, April 2015 to Present

Practice focuses on consumer financial services and consumer protection matters. Counsels financial institutions, consumer reporting agencies, service providers, and others in complying with consumer financial laws and prohibitions against unfair, deceptive, or abusive trade practices. Represents clients before federal and state agencies and the courts, particularly the Federal Trade Commission and Consumer Financial Protection Bureau, in investigations and other proceedings.

**CoreLogic**, McLean, VA
Vice President and Senior Regulatory Counsel, September 2011 to April 2015

Served as lead lawyer and coverage counsel for the CoreLogic credit reporting and consumer data businesses, providing advice and guidance to management on a variety of consumer data and privacy-related regulatory issues, including the Fair Credit Reporting Act (FCRA) and the Gramm-Leach-Bliley Act.

**Federal Trade Commission**, Bureau of Consumer Protection, Washington, D.C.
Assistant Director, Division of Privacy and Identity Protection, May 2006 to September 2011

Supervised attorneys and other staff on investigations and policy work related to credit reporting, consumer privacy, identity theft, and information security.  Primarily responsible for the Fair Credit Reporting Act program, leading the Commission's enforcement, policy, outreach, and rulemaking activities in that area.  Regularly coordinated with the federal financial agencies in the development, issuance, and interpretation of interagency rules, including the Affiliate Marketing Rule, the Risk Based Pricing Rule, the Accuracy and Direct Dispute Rules, and the amendments to Gramm-Leach-Bliley Privacy Rule.

Responsibilities included analyzing and providing comment on legislative proposals to senior Commission staff and Congressional staff, coordinating legal interpretations and policy across intra- and interagency boundaries, and serving as a subject matter expert and resource to Commission staff and industry.  Provided technical assistance to Egypt on oversight and regulation of credit bureaus as part of USAID mission.  Served on the World Bank Credit Reporting Task Force, providing significant contributions to the development of a consultative draft report entitled *General Principles for Credit Reporting*.

**LeClair Ryan,** Alexandria, VA
Partner, January 2002 to May 2006
Associate, February 2000 to December 2001

Developed litigation and counseling practice concentrated on the representation of financial service providers and consumer reporting agencies, including claims brought under state law, the Fair Credit Reporting Act, the Truth in Lending Act, and the Fair Debt Collection Practices Act.  Significant first-chair trial experience.  Responsible for the supervision of junior attorneys and the management of case assignments for office.

**Reed Smith Hazel & Thomas LLP**, Falls Church, VA
Associate, January 1997 to February 2000

Primarily responsible for a variety of civil litigation matters, including commercial matters, software and other technology-related disputes, lender liability, medical malpractice defense, and products liability actions.

**Spriggs & Hollingsworth**, Washington, D.C.
Associate, September 1994 to January 1997

Litigation practice, primarily focused on commercial matters, multi-party toxic tort actions, and insurance coverage disputes.

## Bar Contributions

Chair, 2016 National Institute for Consumer Financial Services Basics, American Bar Association, Section of Business, Consumer Financial Services Committee

Contributor, CFPB Biweekly Updates, American Bar Association, Section of Antitrust, Consumer Protection Committee, 2015 to Present

Faculty, National Institute for Consumer Financial Services Basics, 2013, 2014, 2015, 2016

Observer, Criminal Records Accuracy Committee, Uniform Law Commission, 2015 – Present

Member, American Bar Association, Section of Litigation, Woman Advocate Committee

## Education

**The George Washington University, National Law Center, Washington, D.C.**
Juris Doctor with High Honors, May 1994
　　　Class Rank:　Top 5%
　　　Member, The Order of the Coif
　　　Member, *The George Washington Law Review*
　　　Anne Wells Branscomb Award for Graduating Student with Highest Average
　　　 in Part-Time Course of Study

**Frostburg State University, Frostburg, MD**
Bachelor of Arts, Magna Cum Laude, December 1988
　　　English Major with Business Minor
　　　Commencement Speaker for Graduating Class

## Bar Admissions

Admitted to practice in Maryland, Virginia, and the District of Columbia

### Selected Presentations

*Tenant Screening Basics,* National Association of Professional Background Screeners Annual Conference, September 2016

*Class Actions After Spokeo, Inc. v. Robins*, ABA Section of Business Law Annual Meeting, September 2016

*Privacy Law Developments – Emerging Data Trends, Privacy Law Developments – Employment, Privacy Law Update,* Counselor Library Conference 2016, April 2016

*The Automobile as the Ultimate Mobility Device – Autonomous, Connected, Electric Shared*, FICO World 2016 Conference, April 2016

*Simplified Compliance Management for Screening Companies*, National Association of Professional Background Screeners Annual Conference, September. 2015

*Fair Credit Reporting Act:  Litigation, Regulatory and Enforcement Developments in the Financial Services Industry and Beyond*, Stafford Conferences Webinar, June 2015

*Big Data and Global Privacy*, FICO World Conference, November 2014

*Fair Credit Reporting Act and Financial Privacy*, ABA National Institute on Consumer Financial Law Basics, October 2014

*Alternative Credit Data*, Credit Builders Alliance Credit Building Symposium, July 2014

*CFPB and Furnisher FCRA Obligations*, ABA Consumer Financial Services Committee Winter Meeting, January 2014

*Background Screening:  Is FCRA Compliance Enough or Does the FTC Want More?*, International Association of Privacy Professionals, December 2013

*Top 10 Compliance Challenges for CRAs*, National Association of Professional Background Screeners Annual Conference, September 2013

*International Credit Reporting and Alternative Data*, NCLC/Suffolk Law School, Credit Reporting and Credit Scoring Symposium, June 2012

*Update by the Federal Trade Commission*, 2011 National Association of Professional Background Screeners Annual Conference, March 22, 2011

*Update on the FTC*, 2010 National Credit Reporting Association Annual Conference, November 11, 2010

*Federal FCRA* and *FTC Enforcement Initiatives*, 24th Annual Payment Card Institute, May 6-7, 2010

*The Inside Straight on the Changing Government Role in the Economy*, ACA International's 70th Annual Convention, July 14, 2009

*Implementation of the Affiliate Sharing Rule and Red Flags Rule*, American Bar Association Consumer Financial Services Committee, 2008 Winter Meeting, January 11, 2009

*The FCRA:  It's Not Just for Credit Bureaus*, IAPP Privacy Academy, Sept. 23, 2008

*Identity Theft and Privacy Rules*, 2008 NACCA Examiner's School, May 8, 2008

*Security Freezes and the Impact on the Credit Reporting System*, Fair Isaac's 2007 InterACT Conference, San Francisco, CA, May 15, 2007

*Data Security and Recommendations of the President's Identity Theft Task Force*, Collection and Recovery Solutions 2007 Conference, Las Vegas, NV, May 3, 2007

*Recent Developments in Data Security*, American Financial Services Association, Law Committee Meeting, January 29, 2007

*Current Topics in Credit Reporting and Credit Scoring*, American Financial Services Association, 8th Annual State Government Affairs Forum, September 28, 2006

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**
1880 Century Park East, Suite 900
Los Angeles, California  90067
Tel. 310.446.9900 • Fax 310.446.9909

# PROOF OF SERVICE

My business address is 10866 Wilshire Boulevard, Suite 1550, Los Angeles, California 90024. I am employed in the County of Los Angeles where this service occurs. I am over the age of 18 and am not a party to the within action. I am readily familiar with my employer's normal business practice for collection and processing of correspondence for mailing with the U.S. Postal Service, and that practice is that correspondence is deposited with the U.S. Postal Service the same day as the day of collection in the ordinary course of business.

On the date set forth below, following ordinary business practice, I enclosed a(n) ☒ true copy ☐ original of the following document(s) described as:

## DEFENDANT'S INITIAL DISCLOSURES

☐  (VIA FACSIMILE) by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below, on this date before 5 p.m.;

☒  (VIA MAIL) I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at Los Angeles, California addressed as set forth below;

☐  (VIA OVERNIGHT DELIVERY) I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed as set forth below;

☐  (VIA PERSONAL SERVICE) I caused such envelope(s) to be delivered to a personal courier service to be hand delivered to the addressee below.

Stephanie R. Tatar
Tatar Law Firm, APC
3500 West Olive Ave, Suite 300
Burbank, CA 91505

Erin A. Novak, Esquire
FRANCIS & MAILMAN, P.C.
Land Title Building, 19th Floor
100 S. Broad Street
Philadelphia, PA 19110

Attorneys for Plaintiff

Attorneys for Plaintiff

Executed on May 22, 2017 at Los Angeles, California.

☒  (Federal) I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

_____
Michael Saltz

Case No.:  5:15-cv-04409
File No.:  5.385.011                               3
DEFENDANT'S EXPERT WITNESS DISCLOSURES