**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**
Michael J. Saltz, Esq.  SBN 189751
msaltz@jrsnd.com
Colby A. Petersen, Esq. SBN 274387
cpetersen@jrsnd.com
1880 Century Park East, Suite 900
Los Angeles, CA  90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909

Attorneys for Defendant ON-SITE MANAGER, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL JOHNSON,<br><br>    Plaintiff,<br><br>vs.<br><br>ON-SITE MANAGER, INC.,<br><br>    Defendant. | Case No.: 5:15-CV-04409-BLF<br><br>**DECLARATION OF JOSEPH DAVIDSON IN SUPPORT OF DEFENDANT ON-SITE MANAGER, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint filed:  September 23, 2015<br>First Amended<br>Complaint filed:  January 5, 2016<br>Trial Date:         January 8, 2018<br><br>Hearing Date: August 24, 2017<br>Time:              9:00 a.m.<br>Courtroom.:    3<br>Judge:            Hon. Beth Labson Freeman |

**DECLARATION OF JOSEPH DAVIDSON**

I, Joseph Davidson, do declare:

1. I am over the age of eighteen and Director of Operations for On-Site Manager, Inc. ("On-Site"), a Defendant in the above-captioned matter. If called upon to do so, I could and would competently testify as to the contents of this declaration based upon my personal, first-hand knowledge.

2. I personally have worked in the tenant-screening industry for 21 years and am intimately familiar with industry standards and practices.

Case No.:  5:15-cv-04409
File No.:   5.385.011                                1
DAVIDSON DECLARATION IN SUPPORT OF RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

3. I am one of the custodians of records at On-Site and am intimately familiar with the manner in which On-Site stores business records in the ordinary course of business.

**On-Sites Background and Procedures.**

4. On-Site is a California Corporation based in Campbell California that provides various services to the multi-family housing industry. Its customers consist of primarily property owners and management companies. One of its primary services that it provides its customers is the collection of consumer data from various reputable consumer reporting agencies related to a particular rental applicant for the purpose of allowing its customers to review and evaluate said applicant's financial history, criminal record history, and rental history for the purpose of determining if said applicant satisfies that particular costumer's unique rental criteria.

5. On-Site is a consumer reporting agency ("CRA") that "assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party," and does not "maintain a database of the assembled and merged information from which new consumer reports are produced." As such, On-Site expressly considers itself to be a reseller of other consumer reporting agencies' information under FCRA pursuant to 15 USC § 1681a(u).

6. On-Site performs no approval analysis or evaluation of any of the information it receives from its third-party vendor CRAs and makes no decisions as to a consumer's eligibility or worthiness to lease any property. Rather, On-Site provides its customers with a computer program "calculator" that allows them to pre-input their own personal criterion for the acceptance or denial of rental applicants. Said program then, completely on the customer's side, takes the information On-Site acquires from various third-party vendor CRAs and compares it to the consumer's pre-set criterion. The program then states whether the perspective rental applicant satisfies or does not satisfy said personal criterion of the customer. On-Site is not involved at all in this process – it is entirely done by On-Site's customers at their own locations *after* On-Site has provided said customers with a consumer

report.

7. On-Site buys and resells consumer data and public record information from various reputable CRAs such as Experian, Trans Union, Equifax and Lexis-Nexis.

8. On-Site requires its costumers to provide On-Site with full identifying information of an applicant before any consumer data is requested from On-Site's third-party CRAs, including a full name, full social security number, Government issued identification number (e.g. Driver's License number), and prior addresses. On-Site then transmits this exact identifying information about the applicant to its vendor CRAs, which then search their own databases for consumer records associated with such identifying information. On-Site then assembles and merges the information returned from the vendor CRAs that supplied consumer data on a particular rental applicant into a single report that accurately displays all of the information received from the CRAs.

9. As part of its reasonable procedures to assure maximum accuracy in the data it resells, On-Site initially vets these third-party sources for accuracy and quality of data before agreeing to use them as vendors. Further, On-Site continues to vet its consumer data vendors by repeatedly testing the quality and accuracy of their data multiple times a year for as long as they are vendors of consumer information for On-Site.

10. Further, to minimize mistakes in the input of consumer identify information, On-Site uses an automated process to receive consumer identifying information from its customers and transmits that same information directly to its CRA vendors with a request for consumer information relating to the identified consumer. This process ensures that the consumer identifying information is transmitted to the vendor CRAs without modification.

11. Once On-Site receives the requested consumer information from its vendor CRAs, it merges the vendor CRA's information into a Report pursuant to a proprietary process. On-Site employs numerous measures to assure that it is accurately assembling and merging the data received from the CRAs, including data validation audits to assure that no discrepancies exist between the data provided by the CRAs and the fields of data expected by On-Site's customers.

12. On-Site followed this process with respect to the LexisNexis information it received that was noted in the Preliminary Report concerning Plaintiff Michael Johnson ("Plaintiff"). On-Site has confirmed that it accurately assembled and merged all information it received from LexisNexis pertaining to Plaintiff pursuant to these identified procedures.

13. Because On-Site provides and sells multiple ancillary services to its customers when a rental applicant is accepted, On-Site is greatly incentivized to assist rental applicants in getting accepted by its customers. As such, On-Site employs a Renter Relations group to respond to an applicant's questions and help guide consumers through the dispute process with said vendors should any of their information regarding a particular consumer be incorrect.

14. Specifically, because On-Site is a re-seller of consumer information solely in the possession of a third-party CRA: On-Site has no relationship with the entities that provided such data to said CRAs; no immediate or direct ability to verify the accuracy of the data provided by said CRAs; and no direct ability to prevent those third-party CRAs from mixing or merging data exclusively under their control. What is more, On-Site is under contractual obligations with its third-party CRA vendors to not store in any databases the data that it purchases from said CRAs. This is why On-Site has a policy to go above and beyond what is considered a "reasonable procedure" to assure maximum possible accuracy in the industry and has implemented the following program:

15. When an inquiry for consumer data comes in from a customer, On-Site will obtain consumer information from its vendors in a "Preliminary Report" that it shares with the rental applicant for the purpose of having the applicant review said information prior to that information being put into a final report to be issued to On-Site's customer, upon which the customer will ultimately rely in order to make a decision to accept or decline said applicant.

16. If a rental applicant identifies any consumer data provided by the vendor CRAs that is incomplete or inaccurate during the preliminary period, the rental applicant is told to contact On-Site's Renter Relations group with documentation as to why said consumer information is incomplete or inaccurate so that On-Site may pass such information along to the vendor CRA that reported such information and to have such information corrected so that said data does

not find its way in to the Final Report upon which On-Site's customers will rely to make a final decision.

17. On-Site's customers are told by On-Site not to rely upon, or make rental decisions upon, Preliminary Reports. As such, consumers will not be damaged by any possible incomplete or inaccurate information that is reported by third-party vendor CRAs and is not under On-Site's direct control.

18. Specifically, the Preliminary Report is designed to protect rental applicants from suffering erroneous denials of their applications as a result of possible erroneous information from a vendor CRA. As such, On-Site has included the consumer's input as part of the gathering process of consumer information for the purposes of issuing a Final Report as part of its procedures to assure maximum possible accuracy and to otherwise shield and protect a rental applicant from being damaged by possible inaccurate or incomplete third-party data by making sure such possible inaccurate consumer information is not included in any Final Report.

19. These procedures far exceed that which is, and has been deemed, reasonable in the in the tenant-screening industry.

20. To the best of On-Site's knowledge of the tenant-screening market, On-Site is the only company that goes through the time and expense of taking such an extraordinary step to assure maximum possible accuracy in the consumer reports it issues.

21. When On-Site learns that a reported public record is not associated with a particular consumer, On-Site has a process by which it tags that record with a consumer's social security number so that it is able to prevent such record from appearing in any future reports for the consumer in the event that a third-party CRA continues to report consumer data that On-Site is on notice is possibly erroneous.

22. On-Site issues approximately two million consumer reports per year that contain data On-Site receives from LexisNexis.

23. In contrast, On-Site receives approximately six thousand potentially meritorious disputes per year from rental applicants claiming that information being reported by LexisNexis contains a

1  potential error.

2  24. That's an error rate of approximately 0.3%. As such, On-Site considers the volume of such
3  disputes to be extremely low.

**Plaintiff Michael Johnson and his Prior Rental History.**

5  25. Plaintiff's First Amended Complaint ("FAC") has informed On-Site that he is an individual
6  who purportedly resides in West Sacramento California. [FAC ¶ 4].

7  26. In the course of its investigations, On-Site has learned the following facts directly from
8  Plaintiff himself regarding his prior tenancy at Sterling Apartments on Hurley Way in
9  Sacramento:

10  a. Michael Johnson previously resided at Sterling Apartments on Hurley Way in
11  Sacramento in or about 2009.

12  b. Sterling Apartments is managed by the management company LeFever Mattson, Inc
13  ("LeFever").

14  c. When Plaintiff left Sterling Apartments, he did so in violation of his lease agreement,
15  causing LeFever to reverse Mr. Johnson's move-in concession of $625.00.

16  d. After Plaintiff's security deposit was applied, Plaintiff left Sterling Apartments owing
17  LeFever a balance due of $385.30.

18  27. The facts identified in Paragraph 23 were all confirmed by Plaintiff's documents that were
19  supplied to On-Site at Plaintiff's direction.  A true and correct copy of said documents are
20  attached to the Appendix of Exhibits as Exhibit "2" and marked Johnson 6-7.

21  28. According to Plaitniff's Equifax credit report, LeFever subsequently pursued Plaintiff for said
22  owed balance and reported it as a collection account on Plaintiff's Equifax credit report,
23  which expressly states that Plaintiff owed LeFever $385.00 in 2010. A true and correct copy
24  of Plaintiff's Equifax credit report, which was obtained in the ordinary course of business and
25  is currently stored as a hard copy in Plaintiff's consumer file at On-Site in the ordinary course
26  of business, is attached to the Appendix of Exhibits as Exhibit "3".

**The Issuance of the Preliminary Report and Final Report.**

29. In or about June 2015, Plaintiff applied to the River Pointe Apartments ("River Pointe"). River Pointe in turn requested rental-screening reports from On-Site. During the application process, Plaintiff did not list Hurley Way in Sacramento as a prior address at which he previously resided.

30. Rather, the only prior address that Plaintiff provided to be used by On-Site in requesting consumer information from various vendor CRAs was 2195 Valley Oak Lane in West Sacramento California. As such, On-Site was not initially provided with the Hurley Way address at which Plaintiff eventually admitted he had previously resided – especially the street number and unit number. Therefore, such specific information was not available to be used in the identifying or excluding process of otherwise matching consumer data.

31. As part of the initial screening, On-Site requested records from LexisNexis, its public records vendor, which it re-sold to River Pointe in conjunction with a credit report from Equifax – one of its credit report vendors.

32. LexisNexis uses an algorithm that includes a search that looks for variations of names, including nicknames, to identify potential matches within a defined geographic area, and based thereon, returns data that matches said search algorithm when it possess public containing such available identifiers.

33. In this case, the match algorithm identified a record belonging to "Michael Johnson" (same spelling) in Sacramento, California as potentially relevant to the Plaintiff Michael Johnson, whose application indicated that he lived in West Sacramento, California.

34. In searching for potentially relevant public records, it is a generally accepted practice to search using name and geographic area to identify possible matches.

35. Eviction records rarely, if ever, contain any personal identifiers such as social security number, date of birth, or biometric information. Additionally, On-Site has learned through 18 years of experience in tenant-screening that rental applicants that have been previously a part to an eviction case try to hide the existence of such a fact by not disclosing the eviction case address on their rental application as a prior residence. Thus, it is rare that eviction case records can be matched to a particular consumer through an exact address match. As such,

LexisNexis routinely has no choice but to match court records to consumers based on the same name and geographic area – which in this instance was actually narrowed down to the same street as Plaintiff's prior undisclosed address.

36. On-Site considers that the identification of the Sacramento, California landlord tenant record as potentially relevant is consistent with industry standards and practice.

37. Further, On-Site considers that it was within industry standards and practice for On-Site to rely on the data provided by LexisNexis for the following reasons:

    a. The data provided by LexisNexis contains no obvious errors or inconsistencies.

    b. On-Site had no prior knowledge that the information returned by LexisNexis was not related to Mr. Johnson.

    c. A comparison of the landlord tenant record reflected on the Preliminary Report and the underlying court records demonstrates that the entry on the report accurately reflected the public record.

    d. Further the landlord tenant record also was consistent with the collection record reported about the Plaintiff by Equifax – both records involved the same property company, LeFever.

    e. Finally, Plaintiff failed to provide On-Site with his prior address on Hurley Way prior to the Preliminary Report being created in order to put On-Site on notice that the public record differed in street and unit number from Plaintiff's later-admitted prior residence.

38. As part of On-Site's reasonable procedures to assure maximum possible accuracy and to include the rental applicant in the information gathering process as a source of information, a Preliminary Report was prepared in or about June 2015 that was not yet complete. The Preliminary Report provided by Plaintiff that is attached as Exhibit "1" to the Appendix of Exhibits, and is marked Jonhson 1-5, appears to be an accurate copy of River Pointe's – not On-Site's – version of the Preliminary Report based upon the appearance of River Pointe's summary page, which does not appear on the On-Site version of said Preliminary Report.

39. In fact, said Preliminary Report specifically stated that certain information from certain CRA vendors was still "pending", and as such was a report that was not ready to be issued in its current form. See Exb. 1, Jonson 1.

40. In any event, that Preliminary Report identified that LexisNexis found a "civil action for possession" filed by LeFever against a "Michael Johnson" in Sacramento, California. Basart See Exb. 1 Johnson 1-5.

41. On-Site has obtained a certified copy of the entire public record "civil action for possession" case file number10UD10966 from the Superior Court of California, County of Sacramento. A true and correct certified copy of said court file is attached as Exhibit "4" to the Appendix of Exhibits.

42. As can been seen in Exhibit "4", the public court records associated with a civil action for possession do not contain any social security number (full or partial), nor do they contain a date of birth or other identification for the defendant Michael Johnson. Rather, the records indicate that the address of the property was on Hurley Way in Sacramento, California. See Exb. 4.

43. The Preliminary Report also included a collection account from Equifax involving LeFever dated February 2010. See Exb.1 Johnson 3. The collection account noted an original balance of $385, with a current balance of $0.

44. Such information therefore appeared to On-Site to correspond with the "Civil Action for Possession" filed by LeFever in 2010 against a "Michael Johnson." As such, there did not appear to be any "patent error" on the face of the information that On-Site had received from LexisNexis.

45. On or about June 9, 2015, On-Site sent Plaintiff a copy of the Preliminary Report.

46. Plaintiff then spoke that same day to On-Site's Renter Relations group, which informed Plaintiff that there was a landlord-tenant filing, as well negative credit accounts on his credit report. On-Site then requested that Plaintiff provide it with documentation stating he was not evicted and no outstanding balance was owed to LeFever so that On-Site could help Plaintiff submit his dispute to the proper vendor and clear up any erroneous information.

47. On-Site never heard directly back from Plaintiff.

48. Instead, later in June 2015, On-Site received documentation from River Pointe, which it in turn had received from Plaintiff. A true and correct copy of documentation that Plaintiff provided to On-Site through River Pointe is attached as Exhibit _ to the Appendix of Exhibits marked as Johnson 6-19. Said documents were kept by On-Site in the ordinary course of business in Plaintiff's consumer file at On-Site.

49. Said documentation included rental history records for Plaintiff, who previously held a lease with LeFever Mattson on Hurley Way in Sacramento, California. See Exb. Johnson 6-19.

50. Said rental history documentation provided by Plaintiff confirmed that Plaintiff owed LeFever Mattson $385 at move out, the same amount reflected in the collection account reported by Equifax. Further, said provided records show, however, that although Plaintiff Johnson also had previously rented an apartment at the same street address as reflected in the landlord-tenant record from LexisNexis, the unit number and street number for Plaintiff was different from that of the "Michael Johnson" identified in the "Civil Action for Possession." See Exb. 2 Johnson 6-19.

51. It is important to note at this point that at no time did Mr. Johnson inform On-Site that any other information in the Preliminary Report, other than the information from LexisNexis about the Civil Action for Possession, was incomplete or inaccurate. Moreover, at no time did Plaintiff provide On-Site, through River Pointe or otherwise, any documentation challenging any other consumer information in the Preliminary Report other than those documents challenging the LexisNexis information regarding said Civil Action for Possession. See Exb. 2 Johnson 6-19.

52. On-Site's dispute procedures require On-Site to suppress a landlord-tenant court record if the applicant is not the person identified as the defendant in the action. As such, on the very same day On-Site received Plaintiff's information from River Pointe, On-Site suppressed the subject landlord-tenant action from Mr. Johnson's report, and emailed River Pointe the updated and Final Report as edited by Plaintiff's information himself. A true and correct copy of River Pointe's version of the Final Report is attached as Exhibit "3" to the Appendix of

Exhibits and has been kept in the ordinary course of business as a business record in Plaintiff's consumer file at On-Site.

53. The rental report upon which River Pointe relied in its determination of whether to rent to Mr. Johnson did not contain the LexisNexis record associated with the subject landlord tenant record. See. Exb. ("There were no previous Landlord Tenant Court records found.").

54. River Pointe's own internal score it calculated for Mr. Johnson based entirely on its own criteria indicates that he failed to meet the following minimum qualifications to be eligible to rent at River Pointe: (a) Total monthly income to rent ratio exceeds 3.0; (b) Gross monthly income after rent and estimated debt exceeds 40.0% of the monthly income; and (c) Maximum percentage of past due negative accounts is less than 25.0%. See Exb. 3

55. Notably, the Final Report summary indicates that Mr. Johnson passed the qualification for "No Landlord Tenant Court records or unpaid landlord collections in the last 7 years." See Exb. 3.

56. As such, and contrary to the allegations in the FAC, Plaintiff was not denied housing as a result of any inaccurate or incomplete information in his Final Report regarding a report of a "civil action for possession": Such information is not in the Final Report relied upon by River Pointe to make its decision to decline Plaintiff's rental application, and the Final Report expressly states that he had passed River Pointe's public record criterion. See Exb. 3.

57. Additionally, the Final Report memorializes on the first page in River Pointe's own summary that Plaintiff was actually denied housing based upon information he submitted to River Pointe himself, not information from On-Site; *to wit,* Plaintiff's self-reported income was not high enough to qualify for the particular apartment for which he was applying. See Exb. 3.

58. On-Site's investigation has confirmed that River Pointe emailed Plaintiff a copy of the Final Report on which its decision was based on July 25, 2015. That report, dated June 9, 2015, did not include the landlord tenant record about which Plaintiff complains.

59. Since June 2015 through the present, no other landlord has requested a report from On-Site related to Plaintiff.

60. Prior to preparing the Preliminary Report, On-Site had not received any prior disputes or other information indicating that the LexisNexis case record was not associated with Plaintiff.

61. After the receipt of the information forwarded by River Pointe, however, On-Site tagged the landlord tenant record to prevent it from reappearing on any future reports requested on a Michael Johnson with the Plaintiff's social security number and passed on said information to LexisNexis.

I declare under the penalty of perjury of the United States of America that the foregoing information is true and correct

DATED: July 19, 2017

By: _____
Joseph Davidson

Case No.: 5:15-cv-04409
File No.: 5.385.011

12

DAVIDSON DECLARATION IN SUPPORT OF RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT